# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE )<br>)<br>LIONAL O. SHARP, )<br>an individual, )<br>fdba PRAIRIE SCHOONER )<br>TRANSPORT, )<br>)<br>Debtor. )<br>_____ )<br>)<br>)<br>WHEELS UNLIMITED, INC., )<br>an Oklahoma Corporation, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>LIONAL O. SHARP, )<br>an individual, )<br>fdba PRAIRIE SCHOONER )<br>TRANSPORT, )<br>)<br>Defendant. )<br>_____ ) | Case No. 07-01545-TLM<br><br>Chapter 7<br><br><br><br><br><br><br><br><br><br>Adv. No. 08-06003-TLM |

## MEMORANDUM OF DECISION
_____

## INTRODUCTION

Plaintiff Wheels Unlimited, Inc. ("Wheels") seeks a judgment that a debt

owed by chapter 7 debtor, Lional O. Sharp, fdba Prairie Schooner Transport,

MEMORANDUM OF DECISION - 1

("Sharp") is nondischargeable.  Following a two-day trial[1] and the conclusion of

post-trial submissions, the matter was taken under advisement.

Having carefully considered the evidence, the parties' legal arguments, and

relevant authorities, this memorandum of decision constitutes the Court's findings

of fact and conclusions of law.  Fed. R. Bankr. P. 7052.[2]

## BACKGROUND AND FACTS

Sharp operated a transportation business under the business name of Prairie

Schooner Transport ("PST").  PST was a federally licensed motor vehicle carrier.

PST was never shown to have been a separate legal entity, as opposed to simply a

business name for Sharp.  Sharp testified that, in December, 2006, he ceased doing

business under the PST name.[3]

Sometime in 2005, PST entered into a contract with Fleetwood Travel

Trailers of Oregon, Inc. ("Fleetwood"), a manufacturer of recreational vehicles and

trailers.  Pursuant to this contract, PST agreed to transport a number of trailers (the

---

[1]  The Defendant, Lional Sharp, represented himself *pro se* in this adversary proceeding.

[2]  The Court has jurisdiction over the cause, 28 U.S.C. § 1334(b), § 157(a), § 157(b)(1), and the matter is a core proceeding, 28 U.S.C. § 157(b)(2)(I).  Findings that are based on testimony include the Court's evaluation of the credibility of the witness and the weight to be given the testimony, even if those considerations are not highlighted in the text of the Decision.

[3]  Sharp's personal liability for the obligations of PST could be premised on the absence of proof of the business' separate legal existence.  But the Court need not explore that question, nor a related and untried question of piercing the corporate veil should one have existed, because Sharp's liability was established by a state court judgment prior to bankruptcy which, as discussed later, is preclusive as to the question of liability.

MEMORANDUM OF DECISION - 2

"Trailers") from locations in Idaho and Oregon to the Federal Emergency

Management Administration ("FEMA") at hurricane relief sites in Mississippi and

Louisiana.  Fleetwood agreed to pay PST after delivery of the Trailers and receipt

of invoices.

PST did not employ its own drivers and did not itself have the ability to

haul the Trailers to FEMA.  Therefore, to satisfy the contract with Fleetwood, PST

needed drivers, and it relied on an individual, Keith Tompkins ("Tompkins"), to

find them.  Tompkins was not licensed as a motor vehicle carrier or a

transportation broker and, on the weight of the evidence, was acting as an agent of

PST.  *See* discussion *infra.*

Wheels, an Oklahoma corporation, is a federally licensed motor vehicle

carrier.  In fall 2005, Wheels' dispatcher, David Marsh ("Marsh"), had been

looking for loads that Wheels' drivers in the western Idaho area could haul.[4]

Marsh's responsibilities as Wheels' dispatcher required him to routinely make

"cold calls" to manufacturers, brokers and individuals in order to find loads for

Wheels' drivers and to create working relationships with such manufacturers.

Marsh was also responsible for negotiating the payment terms for Wheels'

services.  Marsh Depo. at 10-12.

---

[4]  Marsh's testimony is contained in a deposition from a prior state court action used at
the trial in this adversary proceeding (the "Marsh Depo.").  Fed. R. Bankr. P. 7032; Fed. R. Civ.
P. 32.

MEMORANDUM OF DECISION - 3

Marsh called a Caldwell, Idaho manufacturer, C and B Quality Trailer Works, but the individual he spoke with did not need any drivers. That individual suggested Marsh talk with "a guy that had a trailer that's going back to Purvis, Mississippi" who just happened to be sitting there with him in the C and B offices at the time. That man was Tompkins. Marsh Depo. at 12.

Tompkins told Marsh that "he had" a number of Jayco and Fleetwood campers and trailers that needed to go from Oregon manufacturers to Mississippi for hurricane relief, and that he did not have enough drivers himself to deliver the Trailers. Marsh indicated Wheels might be able to help. In reply to Marsh's question about what rate would be offered, Tompkins "said he could give me a dollar a mile for a said number of miles." Marsh Depo. at 13.[5]

Marsh agreed Wheels would provide the drivers, and he and Tompkins made arrangements for pick up of the Trailers in Caldwell. They agreed payment was to be made to Wheels upon its overnight delivery of the transport documentation to Tompkins once the Trailers arrived in Mississippi.

Marsh had never previously spoken to nor conducted business with Tompkins. Nevertheless, the arrangement was made over the course of this phone

---

[5] Marsh indicated that he did not "remember what [Tompkins] actually quoted as far as the mileage." *Id.* However, he later testified that Tompkins had a number in mind of the mileage from Caldwell to Purvis, and that the mileage to be used in the dollar-per-mile rate was a "fixed number, so to speak." Marsh Depo. at 13-14. Marsh later recalled that this fixed number was 2,226 miles. Marsh Depo. at 49-50.

MEMORANDUM OF DECISION - 4

conversation, and Wheels started dispatching drivers. There was never any written

agreement between Wheels and Tompkins; "[i]t was all verbal." Marsh Depo. at

19. Marsh indicated that while Wheels had written agreements with some

customers, it did not have written agreements with "most" of its customers. *Id.*[6]

Thus, based on the Marsh-Tompkins conversation, Wheels started

transporting Trailers to FEMA.[7] Wheels also started issuing invoices to

Tompkins.[8] Wheels continued this process over the next several weeks.

According to Marsh, Tompkins never identified PST or Sharp as involved

with this arrangement on the Trailers. Marsh first discovered Sharp's involvement

upon his review of the documents used by Wheels' drivers in hauling the Trailers.

The bills of lading, which accompanied the delivered shipments and were then sent

to Wheels, had been issued by Sharp.[9] They list Fleetwood as the shipper and

---

[6] Wheels did make arrangements directly with Fleetwood and Jayco for delivery of certain trailers. Marsh Depo. at 41-42. In that situation, there was apparently some written agreement, though it did not address the rate to be charged. *Id.* at 43-45

[7] Marsh testified his conversation with Tompkins occurred "around November 10." Marsh Depo. at 15. This date conflicts with Wheels' evidence that it first began picking up Trailers on October 22, 2005, and, by the end of that month, had already picked up and started hauling six Trailers. *See* Exs. 110, 111.

[8] Wheels' invoices to Tompkins listed "Keith Tompkins, Caldwell, ID" in the "Bill to" field. *See* Exs. 123-126. These invoices contain no reference to Sharp or PST. Wheels' table summarizing the invoices to Tompkins contains a column labeled "Invoice to" and populated with the entry "KT." *See* Exs. 110, 111. The summary also references one later invoice to "PST."

[9] The "header" on the bills of lading states "Lional O. Sharp, D/B/A/ PRAIRIE SCHOONER TRANSPORT."

MEMORANDUM OF DECISION - 5

various entities in Mississippi as the consignee.  The drivers, however, all indicated to Marsh that they had dealt only with Tompkins, and did not know of Sharp.

Marsh tried to find a reference to Tompkins on Internet websites related to federally authorized motor vehicle carriers.  Finding none, Marsh asked Tompkins several times for the name of his company.  Tompkins told Marsh that he worked for a towing company in Oregon, but Marsh was unable to confirm the location or existence of that business.  Marsh Depo. at 25-26.[10]

Tompkins failed to pay for the initial deliveries and responded to Marsh's inquiries about payment by, first, questioning whether all the drivers' paperwork had been completed and received by Wheels and, thereafter, by telling Marsh that the manufacturers had changed their time frame for payment from ten or fourteen days to twenty-one days.  But even after twenty-one days Wheels had still not been paid.  Marsh Depo. at 27-28.[11]

Though Sharp's capacity in the transaction was never mentioned by

---

[10]  Marsh could not recall at his deposition what name was given, but other evidence suggests it was "Central Transport."  Nothing in the deposition indicates that Marsh directly asked Tompkins to explain the presence of Sharp/PST's name on the bills of lading or their involvement in the transaction.

[11]  Marsh indicated that the calls to Tompkins occurred starting in mid-November, and that Marsh felt that "something was not right at that point."  Marsh Depo. at 27.  The concern increased, with Marsh thinking that Tompkins was "giving [him] the runaround."  *Id.* at 32.  Wheels continued to pick-up and transport trailers, however.  Marsh testified that "even though I had that feeling that something was going wrong, I was hoping that I was wrong and that eventually we would get paid."  *Id.* at 34.

MEMORANDUM OF DECISION - 6

Tompkins and not clearly identified on the bills of lading, Wheels eventually concluded that Sharp, not Tompkins, was the actual carrier for the transport of the Trailers to the FEMA consignees in Mississippi.[12]

Wheels contacted Sharp and demanded payment for its completed shipments of the Trailers.  Sharp had a phone call with Darren Southerland, Wheels' president, in which Sharp acknowledged his obligation to pay Wheels based on Tompkins' conversations and oral agreements with Marsh.  Though Sharp then claimed he did not know the terms of the agreement arising from the Marsh-Tompkins' conversations, he assured Southerland that "payments to Wheels would be made through [Sharp]."[13]

By the end of December 2005, Wheels had delivered a total of thirty-five trailers to FEMA.  Wheels' invoices to Tompkins, and one last invoice issued to PST, for those 35 Trailers totaled $76,296.95.  *See* Ex. 110.[14]

Wheels demanded that Sharp pay the entire $76,296.95, but Sharp refused.[15]

---

[12]  Marsh took the PST name off the bills of lading and investigated, finding PST's federal authority.  Marsh Depo. at 25.  At some point in late 2005, Wheels came to the conclusion that Tompkins was acting as an agent for or employee of PST.  *Id.* at 36-37.

[13]  Contrary to this acknowledgment, Sharp has also argued that PST had a "lease" or other arrangement with Tompkins under which PST would pay Tompkins and that Tompkins was the sole party obligated to pay Wheels.  *See, e.g.*, Answer, Adv. Doc. No. 4.

[14]  This amount represents invoices to Tompkins for $73,985.95, and a $2,311.00 invoice to PST, for the delivery of the Trailers.  This reflects an average charge of about $2,180.00 per Trailer.

[15]  During the same period that Wheels was demanding payment, Fleetwood paid PST for
(continued...)

MEMORANDUM OF DECISION - 7

Sharp testified that the primary reason he did not pay Wheels was that he did not know the details of the payment terms Tompkins had promised Wheels.[16]

To resolve the payment dispute with Wheels, Sharp retained an attorney, John L. Lerma ("Lerma"). In a January 5, 2006 letter to Wheels, Lerma explained that it was Sharp's understanding that Tompkins had promised Marsh a "flat rate of $1,865.00" for each Trailer it delivered. Ex. 120. Included with the letter was a cashiers check made payable to Wheels in the amount of $18,650.00, for the delivery of ten of the Trailers at that rate. Ex. 119. The letter claimed that payment to Wheels for the delivery of additional trailers was not yet due and owing.

The following month, Wheels filed suit against Sharp, Fleetwood, and Tompkins in the Fourth Judicial District of the State of Idaho. Wheels' breach of contract action against Sharp sought a money judgment for $57,646.95.[17]

On April 16, 2007, the state court entered a default judgment against Sharp in the amount of $80,316.11, including the principal debt as alleged, interest and

---

[15] (...continued)
its services related to the delivery of the Trailers. PST, in turn, paid Tompkins.

[16]   Sharp also claimed Wheels did not provide PST with all of the necessary transportation documents. Wheels countered that it gave PST the invoices, VINs and bills of lading for the Trailers it delivered, and that nothing else was required in order that it be paid.

[17]   This figure represents the total invoices of $76,296.95, less the $18,650.00 cashiers check.

MEMORANDUM OF DECISION - 8

fees, and dismissing Sharp's counterclaim.  Ex. 100 ("State Court Judgment").[18]

In October 2007, Sharp filed a chapter 7 bankruptcy petition and scheduled Wheels' judgment in the amount of $83,000.00.  Case No. 07-01545-TLM at Doc. No. 1, schedule F.[19]  Wheels initiated this adversary proceeding to have Sharp's debt declared nondischargeable under §§ 523(a)(2)(A), (a)(4), and (a)(6).[20]  Adv. Doc. Nos. 1, 11.

In May 2008, Wheels sought summary judgment, arguing that the State Court Judgment entered against Sharp should be given issue preclusive effect on the dischargeability issues.  Though the Court denied that request, it determined and ruled that the State Court Judgment was preclusive as to the existence of a liquidated indebtedness owed Wheels by Sharp and as to the dismissal of counterclaims asserted by Sharp.

At trial, Wheels withdrew its § 523(a)(4) cause of action, proceeding only on the causes under § 523(a)(2)(A) and § 523(a)(6).

At the close of evidence, Sharp requested additional time to review the depositions of two witnesses used by Wheels at trial.  The Court granted the

---

[18]  Sharp answered and asserted a counterclaim, but his attorney then withdrew.  Sharp failed to appear and defend further.

[19]  The Court takes judicial notice of its files in the chapter 7 case, Case No. 07-01545-TLM, pursuant to Fed. R. Evid. 201.  Pleadings in the chapter 7 are identified by "Doc. No."

[20]  Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, 11 U.S.C. § § 101-1532.

MEMORANDUM OF DECISION - 9

request and allowed the parties to file post-trial submissions addressing the deposition testimony. Sharp timely filed his post-trial submission. *See* Adv. Doc. No. 33 ("Debtor's Post-Trial Submission"). Wheels responded with a motion to strike, arguing that portions of Debtor's Post-Trial Submission violated the Court's announced limitations on such submissions. *See* Adv. Doc. No. 32 ("Motion to Strike").

## DISCUSSION AND DISPOSITION

### A.  Motion to Strike

In granting Sharp's request for additional time to review the depositions, the Court allowed him to file a post-trial response for the purpose of directing the Court to specific, relevant testimony in the depositions not already identified by Wheels. *See* Fed. R. Civ. P. 32(a)(6), incorporated by Fed. R. Bankr. P. 7032. The Court made clear, however, that it would not consider written argument, the parties having been provided, and exercising, an opportunity to make oral closing arguments.

While Debtor's Post-trial Submission does identify some deposition testimony Sharp believes to be relevant, it also contains extraneous documents and additional argument. Those documents and argument are beyond the scope of submissions expressly permitted by the Court. The Motion to Strike therefore will be granted, and the Court will consider only those portions of Debtor's Post-trial

MEMORANDUM OF DECISION - 10

Submission addressing the deposition testimony.

### B.   Dischargeability of debt

Based on this Court's summary judgment ruling, the State Court Judgment

established that Sharp owes a debt to Wheels.[21]  The issue here is whether that debt

is nondischargeable under § 523(a)(2)(A) or § 523(a)(6) of the Bankruptcy Code.

The standard of proof for dischargeability exceptions under § 523(a) is

preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 291 (1991).  It is

also clear that exceptions to discharge are strictly construed against the plaintiff

creditor and liberally in favor of the debtor.  *Spokane Ry. Credit Union v. Endicott*

*(In re Endicott)*, 254 B.R. 471, 475 n.5, 00.4 I.B.C.R. 199, 200 (Bankr. D. Idaho

2002) (citing *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992)).

### 1.   The claim under § 523(a)(2)(A)

Section 523(a)(2)(A) excepts from discharge any debt obtained through

"false pretenses, a false representation, or actual fraud."  Section 523(a)(2)(A).

To fall within this exception to discharge, a creditor must prove that (1) the

defendant made a representation; (2) which at the time the defendant knew was

false; (3) the representation was made with the intent to deceive; (4) the plaintiff

---

[21]   In its pretrial briefing and at trial, Wheels also argued that Sharp entered a
"subcontract" with Tompkins for the movement of the Trailers.  Wheels claims this Sharp-
Tompkins subcontract was unlawful since Tompkins was not licensed as a motor carrier or a
transportation broker and, as a result, Sharp was directly liable to Wheels.  However, because
Sharp's liability to Wheels was preclusively established by the State Court Judgment, and clearly
exists under agency principles discussed *infra*, the Court need not address the "unlawful
subcontract" theory in order to establish Sharp's liability.

MEMORANDUM OF DECISION - 11

justifiably relied on the representation; and (5) the plaintiff sustained the alleged

loss as the proximate result of the representation. *Diamond v. Kolcum (In re*

*Diamond)*, 285 F.3d 822, 827 (9th Cir. 2002); *Am. Express v. Hashemi (In re*

*Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996); *Wells Fargo Bank Northwest,*

*N.A. v. Covino (In re Covino)*, 04.3 I.B.C.R. 98, 103-04 (Bankr. D. Idaho 2004).

A debt may be nondischargeable under § 523(a)(2)(A) "either when (1) the

debtor personally commits actual, positive fraud, or (2) the actual fraud of another

is imputed to the debtor under partnership/agency principles." *Tsurukawa v. Nikon*

*Precision, Inc. (In re Tsurukawa)*, 287 B.R. 515, 525 (9th Cir. BAP 2002) (citing

*Strang v. Bradner*, 114 U.S. 555, 561 (1885); *Neal v. Clark*, 95 U.S. 704, 709

(1877)).[22]  Actual fraud by a debtor's agent may be imputed to the debtor for

nondischargeability purposes even where the debtor has no knowledge of that

fraud. *Tsurukawa*, 287 B.R. at 525-26.

The representation establishing the actual fraud may be a promise.[23]

Therefore, given *Tsurukawa*, for purposes of § 523(a)(2)(A), an actionable

"promissory representation" may be made by the debtor, or by a debtor's partner,

joint venturer or agent.

---

[22]  Actual fraud differs from "constructive" fraud. *Id.*

[23]  *See McCrary v. Barrack (In re Barrack)*, 217 B.R. 598, 606 (9th Cir. BAP 1998); *In re Rubin*, 875 F.2d 755, 759 (9th Cir. 1989); *In re Covino*, 04.3 I.B.C.R. at 103-04; *Wussler v. Silva (In re Silva)*, 00.2 I.B.C.R. 66, 69 (Bankr. D. Idaho 2000); *Bell v. Smith (In re Smith)*, 98.4 I.B.C.R. 119, 120, 232 B.R. 461 (Bankr. D. Idaho 1998).

MEMORANDUM OF DECISION - 12

Wheels alleges that the debt owed to it by Sharp was obtained through Sharp's own actual fraud. Wheels essentially argues in the alternative that Tompkins' conduct was fraudulent, and that such conduct should be imputed to Sharp since he and Tompkins had formed a joint enterprise or a partnership, or because Tompkins was Sharp's agent.

Sharp denies any personal fraudulent conduct, and also claims that any fraud committed by Tompkins is not attributable to him because Tompkins was an independent contractor.

### a.      Direct actual fraud

Under the evidence, the only representations made directly by Sharp to Wheels were in his telephone conversations with Southerland.[24] In those evidently short but heated discussions, Sharp indicated PST would pay for the hauling of the Trailers, though he clearly disputed the amount to be paid.

Wheels did not establish by a preponderance of the evidence that § 523(a)(2)(A) applies to such representations. That the promise to pay was false and known to be false is belied by the Lerma letter and simultaneous tender of the $18,650.00 cashiers check. And that there was reliance on this promise and proximate injury is negated by the fact that the deal was struck and the majority of

---

[24] Marsh's deposition does not indicate that he ever spoke to Sharp.

MEMORANDUM OF DECISION - 13

the Trailers transported before Sharp's representation of payment was made.[25]

Given the failure of the evidence to establish direct actual fraud by Sharp, the § 523(a)(2)(A) cause turns on whether Tompkins committed actual fraud and whether the same can be imputed to Sharp.

### b.   Imputed actual fraud

### i.   Tompkins was Sharp's agent

Idaho law recognizes three types of agency: express authority, implied authority, and apparent authority. *Nelson v. Anderson Lumber Co.*, 99 P.3d 1092, 1098 (Idaho Ct. App. 2004). Any of these types of agency may bind the principal to a contract entered into by an agent with a third party. *Id.*

Express and implied authority are forms of actual authority. *Id.* Express authority exists when the principal has explicitly authorized the agent to act in the principal's name, and implied authority is that "which is necessary, usual, and proper to accomplish or perform" the express authority delegated to the agent by the principal. *Id.*[26]

The existence of an agency is a question of fact, and the party alleging an agency has the burden of proof. *Hausam v. Schnabl*, 887 P.2d 1076, 1079 (Idaho

---

[25]  Sharp's assurance to Southerland that "payments would be made through [Sharp]" was made in late December 2005. On December 27, 2005, Wheels delivered the final Trailer to FEMA. *See* Exs. 110, 111. Lerma's letter to Wheels was dated January 5, 2006.

[26]  Apparent authority differs from actual authority in that it is not based on the words and conduct of the principal toward the agent, but on the principal's words and conduct toward a third party. *Id.*

MEMORANDUM OF DECISION - 14

Ct. App. 1994).  Authority of an agent to act for a principal may be inferred from dealings, circumstances, acts and conduct.  *Nelson v. World Wide Lease, Inc.*, 716 P.2d 513, 517 (Idaho Ct. App. 1986).

Sharp admits authorizing Tompkins to locate drivers to haul the Trailers to FEMA so that Sharp could satisfy his contract with Fleetwood.  He also authorized Tompkins to arrange for the shipments of the Trailers using his bills of lading (that is, under Sharp's name and operating authority).  Thus, Tompkins had the express authority to find and contract for drivers to haul the Trailers on Sharp's behalf.

There is no evidence that Sharp limited Tompkins' authority to negotiate terms in obtaining the drivers for the Trailers.  Because negotiating and establishing payment terms, including the rate to be charged, was a "necessary, usual, and proper" task in Tompkins' exercise of his express authority, Tompkins had the implied authority to do so.

Tompkins' express and implied authority to act on Sharp's behalf establishes the existence of an agency.[27]  Based on this relationship, Tompkins' alleged fraudulent conduct – **if** proven by Wheels – may be imputed to Sharp, the principal.  *In re Tsurukawa*, 287 B.R. at 525.

---

[27]  This conclusion eliminates the need for the Court to determine whether an agency existed based on apparent authority (*i.e.*, Sharp's communications or conduct with Wheels), or whether Sharp and Tompkins formed a partnership or joint venture.  However, the Court notes that Sharp provided no evidence in support of his argument that Tompkins was an independent contractor rather than an agent.  *See Melichar v. State Farm Fire and Cas. Co.*, 716 P.2d 513, 518 (stating the test establishing a principal-agent relationship as opposed to an independent contractor); *Nelson*, 716 P.2d at 518 (same).

MEMORANDUM OF DECISION - 15

### ii.    Representations made

To address the first element of § 523(a)(2)(A), it must be established what representation the fraud action is predicated upon.

In its complaint and in argument, Wheels claims Tompkins promised Marsh (a) that Wheels would be paid and (b) payment would be at a rate of $1.00 per mile for each Trailer hauled.  Sharp does not dispute that Tompkins promised Wheels it would be paid, but does claim Tompkins and Wheels discussed and agreed on a flat rate of $1,865.00 per Trailer.[28]

In establishing what representations were actually made by Tompkins, it is critical to note that Marsh is the only witness testifying in this adversary proceeding with personal knowledge of the Marsh-Tompkins conversations.[29] Marsh testified that Tompkins made the representations not only that there would be payment, but also that it would be at the dollar-per-mile rate.

The preponderance of the evidence, indeed the only competent direct evidence, establishes that Tompkins told Wheels both that it would be paid and that the rate would be a dollar-per-mile.

---

[28]   The $1,865.00 is less than the amount calculated using the dollar-per-mile rate, whether the dollar-per-mile was at the "fixed" mileage suggested in Marsh's testimony, *see* Marsh Depo. at 13-14, and at 49-50 (mileage of 2,226) or actual mileage as recorded by the drivers.  The Court need not resolve the ambiguity since the amount of the subject indebtedness was established by the State Court Judgment.

[29]   While both Sharp and Southerland testified at trial regarding the Marsh-Tompkins conversations, neither was a participant in any of those conversations.  Tompkins was not called to testify.

MEMORANDUM OF DECISION - 16

### iii.    Falsity and knowledge

Wheels must next prove these representations were false and known to be false at the time they were made.  Since direct evidence of fraudulent intent is unlikely, knowledge and intent may be proven through circumstantial evidence. *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1018 (9th Cir. 1997).

### aa.    Promise to pay

Tompkins told Wheels that it would be paid for hauling the Trailers, and it is clear that Tompkins never paid Wheels.  However, Tompkins was clearly acting on behalf of Sharp in making the arrangement with Wheels to move the Trailers. Tompkins had no contract with Fleetwood or Jayco and no interest in ensuring the Trailers were transported other than as an agent for Sharp.[30]

Sharp argued that Tompkins was supposed to pay Wheels.  Sharp also paid Tompkins during this period.[31]  But on the whole, the record is inadequate to establish that Tompkins knew he was responsible for paying Wheels.  Absent this knowledge, there is no circumstantial evidence that at the time Tompkins made the representation Wheels would be paid, he knew it was false.  Even if Tompkins did not intend to pay Wheels personally, given his capacity as agent, his lack of personal interest in transporting the Trailers, and the lack of evidence regarding

---

[30]  Whether Tompkins had personal liability to Wheels by virtue of his conduct is something beyond the scope of the instant adversary proceeding.

[31]  Precisely how much was paid Tompkins by Sharp was not established.

MEMORANDUM OF DECISION - 17

Tompkins' knowledge, that Wheels would be paid by Sharp is a reasonable inference.  Wheels therefore failed to prove Tompkins knowingly made a false statement regarding payment.

### bb.    Promise to pay a dollar-per-mile

Wheels also argues that Tompkins' promise of a dollar-per-mile rate was knowingly false.  The weight of the evidence indicates that Tompkins, like Marsh, was free to negotiate terms for hauling, such as the rate.  There is no evidence that Sharp had limited Tompkins' negotiating authority or instructed him not to offer or promise payment at a dollar-per-mile rate, which might suggest knowing falsity.  Nor is there other circumstantial evidence suggesting that the rate was falsely and fraudulently offered to get Wheels to agree.[32]

That Tompkins knowingly made a false representation regarding the rate was not established by preponderating evidence.[33]

---

[32]  The difference in this case between a flat rate of $1,865.00 and a dollar-per-mile appears to be $11,021.95.  ($1,865.00 x 35 Trailers = $65,275.00; the principal debt claimed by Wheels for thirty-five Trailers is $76,296.95.)  That Wheels would have refused to haul the Trailers without the dollar-per-mile term and that Tompkins knew of such position was not established by the evidence.  There is nothing, for example, to indicate a flat rate was rejected by Wheels, supporting the idea that a subsequent dollar-per-mile rate was falsely offered to induce Wheels to enter into the arrangement and commence hauling the Trailers.  In fact, Marsh's testimony is equivocal on the idea of a floating dollar-per-mile rate basis; it suggests that the rate was to be calculated on a set number of miles, a "fixed number, so to speak," and was perhaps 2,226 miles.  Marsh Depo. at 13-14, 49-50.

[33]  The failure of any one element, here falsity of either representation, is fatal to the cause of action.  *See Mire v. Ankersmit (In re Ankersmit)*, 03.1 I.B.C.R. 70, 73 (Bankr. D. Idaho 2003).  For completeness, however, the Court will address the other elements.

MEMORANDUM OF DECISION - 18

### iv.    Intent to deceive

Even if the preponderance of the evidence supported the conclusion that Tompkins' representations were known to Tompkins to be false, Wheels must also prove those representations were made with the intent and purpose to deceive it.

Intent to deceive is a question of fact which also may be inferred from the surrounding circumstances. *In re Kennedy*, 108 F.3d at 1018; *Smith*, 232 B.R. at 466. "A promise made with a positive intent not to perform or without a present intent to perform satisfies § 523(a)(2)(A)." *In re Barrack*, 217 B.R. 598 at 606 (quoting *In re Rubin*, 875 F.2d at 759). In essence, the promise is falsely made to induce the other party to act to its detriment. A promise may also be fraudulent "where the promisor knew or should have known of his prospective inability to perform." *In re Barrack*, 217 B.R. at 606 (quoting *Firestone*, 26 B.R. 706, 715 (Bankr. S.D.Fla. 1982)).

There was no evidence submitted to establish that the promise of payment was false because Tompkins knew of a prospective inability to pay. Fleetwood had agreed to pay PST if it performed its obligation to deliver the Trailers. That Tompkins or PST *could not* pay was not established, only that (excepting the $18,650.00) they *did not* pay.

The other evidence that potentially relates to an actual intention not to perform is equivocal. Tompkins, according to Marsh, stalled when contacted about payment, serially blaming lack of documents and a change in the Trailer

MEMORANDUM OF DECISION - 19

manufacturer's payments as reasons for the delay in Wheels' payments.  Tompkins also never fully answered Marsh's questions about the name and nature of his business.  These are suspicious acts.

However, the bills of lading from the outset reflected PST's involvement.  It is not clear if Tompkins' statements evidenced his prior and continuing intent not to pay and to deceive, or simply were part and parcel of a poorly detailed, undocumented transaction, and one in which information from and through PST was necessary before Tompkins could reply to Marsh's inquiries.

The transaction commenced in late October or early November 2005 and, by December, Sharp had acknowledged his liability for the debt to Wheels, assuring Southerland that "payments to Wheels would be made through [Sharp]." This was followed in short order by the January 5, 2006, Lerma letter further acknowledging Sharp's liability, and tendering a partial payment to Wheels based upon Sharp's position that the rate was $1,865.00 per Trailer.  That Wheels anticipated the payment would be calculated at a different rate is consistent with its breach of contract cause alleged in state court, but it is not evidence of a positive and fraudulent intent by Tompkins that Wheels would not be paid at all.

The fact that Sharp made a payment to Wheels using the flat rate of $1,865.00 per Trailer might suggest an intent not to pay at the rate of a dollar-per-mile, making that specific representation false.  But Marsh's own testimony about the rate, and his lack of recollection about the exact number of miles at which the

MEMORANDUM OF DECISION - 20

rate would be fixed, negate the idea that the rate calculation was key enough that Tompkins would have falsely represented such a rate as a means to fraudulently induce Wheels' reliance.

Considering all the circumstantial evidence, the Court cannot find that Tompkins made the representation Wheels would be paid at a dollar-per-mile with the intent to deceive it and induce its reliance.

<strong>v.    Justifiable reliance</strong>

The promise here, in essence, was that Wheels would be paid for its role in moving the Trailers to FEMA relief sites. By whom it would be paid, or precisely how much, and even when or on what conditions it would be paid are all ambiguous areas. This ambiguity results from the decided informality of the verbal arrangement. This arrangement was created solely upon Marsh's unsolicited telephone conversation with an unknown individual in C and B's offices. The arrangement was never reduced to writing, or even confirmed in writing, nor did Marsh even identify precisely with whom Wheels' deal was made.

As noted, the Court finds the two representations were made. Even if one assumes, contrary to the foregoing findings, that they were knowingly false and that they were made with intent to deceive, Wheels must still prove its reliance thereon was justifiable.

Justifiable reliance is a subjective standard, which is a "matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the

MEMORANDUM OF DECISION - 21

particular case, rather than of the application of a community standard of conduct

to all cases." *Field v. Mans*, 516 U.S. 59, 71 (1995) (quoting Restatement

(Second) of Torts § 545A cmt. b (1976)).  This standard requires the Court to

consider the "knowledge and relationship of the parties" and "all of the

circumstances surrounding the particular transaction." *Eugene Parks Law Corp.*

*Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1456-60 (9th

Cir. 1992).  *See also Tallant v. Kaufman (In re Tallant)*, 218 B.R. 58, 67 (9th Cir.

BAP 1998).

    Justifiable reliance does not require that the creditor investigate the truth of

the representation in each case.[34]  However, an investigation is required "where,

under the circumstances, the facts should be apparent to one of his knowledge and

intelligence from a cursory glance, or he has discovered something which should

serve as a warning that he is being deceived." *Field*, 516 U.S. at 71 (quoting W.

Prosser, Law of Torts § 108, P. 718 (4th ed. 1971)).  That is, a plaintiff cannot

recover under § 523(a)(2)(A) if he "blindly relies on a misrepresentation the falsity

of which would be patent to him if he had utilized his opportunity to make a

cursory examination or investigation." *Id*. (quoting Restatement (Second) of Torts

---

[34]  *See Field*, 516 U.S. at 70-71 (stating that "a person is justified in relying on a
representation of fact 'although he might have ascertained the falsity of the representation had he
made an investigation.'")

MEMORANDUM OF DECISION - 22

§ 541 cmt. a (1976)).[35]

Very little of Wheels' evidence or argument focused on this element of the § 523(a)(2)(A) cause.  However, there are two aspects of the record that suggest Wheels met the required standard.

First, Marsh's testimony suggests it was routine for Wheels to orally agree to payment terms.  Marsh indicated that while Wheels had written agreements with "some" of its customers, it did not have such agreements with "most" of its customers.  Marsh Depo. at 19.  Even in its more fulsome written agreements with Fleetwood, there was no specification of the rate.  *Id.* at 44-45.

True, Marsh had never previously conducted business with Tompkins, and the agreement here stemmed from Marsh's "cold call" to another party who just happened to be visiting with Tompkins.  On the other hand, there was no evidence that it was typical for Wheels or Marsh to investigate the shippers it contacted before entering into transportation agreements.[36]

Second, the representations at issue were that Wheels would be paid and that payment would be at a particular rate.  These were not representations of an

---

[35]  *See also Citibank (South Dakota), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1038, 1090-91 (9th Cir. 1996) (stating that "although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth."); *In re Anastas*, 94 F.3d at 1286 (stating that reliance is not justifiable where a creditor ignores red flags prompting him to conduct an investigation into the representation).

[36]  Later concerns that he was getting the "runaround" by Tompkins led Marsh to search public records for Tompkins' company or federal carrier authority but this provides no basis to conclude pre-contracting investigations were common practice for Wheels.

MEMORANDUM OF DECISION - 23

existing fact which, even if red flags were raised, could be verified.  There was also nothing shown to be preposterous in these representations that would signal the need for investigation.[37]

Wheels would not, on this record, meet a standard of reasonable reliance. Agreeing to transport several dozen Trailers halfway across the country, with an unknown party on a cold call, and without verifying that other party's identity and financial capacity, and without documenting the agreement in writing or even sending a confirming letter, is not "reasonable."  But the justifiable reliance standard is less rigorous, and the Court concludes that Wheels established, though narrowly, its reliance upon Tompkins' representations was "justifiable."

### vi.    Proximate cause

Wheels' money damages were established by the State Court Judgment. Though the loss was a result of Sharp's failure to pay Wheels, the preponderance of the evidence establishes that it was the result of a breached contract, and not the proximate result of any fraudulent representation.

Upon all the foregoing, Wheels did not carry its burden.  The Court will dismiss the cause of action seeking to render the subject indebtedness nondischargeable under § 523(A)(2)(A).

---

[37]   Assume, for example, that Tompkins had represented that his company, Central Transport, was a federally authorized motor vehicle carrier, and further assume that evidence established that it was common practice for Wheels to verify such assertions as a prerequisite to contracting.  A failure of Wheels to do so would then raise issues of justifiable reliance.

MEMORANDUM OF DECISION - 24

## 2.    The claim under § 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides that an individual

debtor may not discharge any debt "for willful and malicious injury by the debtor

to another entity or to the property of another entity."  Section 523(a)(6).[38]

A breach of contract claim gives rise to nondischargeability under

§ 523(a)(6) only if it is accompanied by tortious conduct.  *Lockerby v. Sierra*, 535

F.3d 1038, 1040-41 (9th Cir. 2008).  Conduct is tortious for purposes of

§ 523(a)(6) only if it constitutes a tort under state law.  *Id.* at 1041.

Wheels' state court suit against Sharp was based on breach of contract and

contained no cause of action for fraud or any other tort.

Wheels, of course, claims in this adversary proceeding that Sharp's conduct

constitutes fraud under Idaho law.[39]  If true, this would establish the tort that must

accompany the contract breach in order to obtain relief under § 523(a)(6).

---

[38]   The willful injury requirement of § 523(a)(6) is separate from the malicious injury
requirement.  *See Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702 (9th Cir. 2008).
Willfulness requires a "deliberate or intentional *injury*, not merely  . . . a deliberate or intentional
*act* that leads to injury."  *Kwaauhau v. Geiger*, 523 U.S. 57, 61 (1998); *Ditto v. McCurdy*, 510
P.3d 1070 (9th Cir. 2007).  This requires that the debtor "desires to cause consequences of his act,
or that he believes the consequences are substantially certain to result from it."  *Ditto*, 510 P.3d at
1078.   A "malicious" injury requires a "(1) a wrongful act, (2) done intentionally, (3) which
necessarily causes injury, and (4) is done without just cause or excuse.'"  *Carrillo v. Su (In re
Su)*, 290 F.3d 1140, 1146-47 (9th Cir. 2002) (quoting *Petralia v. Jercich (In re Jercich)*, 238 F.3d
1202, 1209 (9th Cir. 2001)).

[39]   In Idaho, a plaintiff alleging fraud must prove: (1) a statement or a representation of
fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's
intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance
by the hearer; (8) justifiable reliance; and (9) resultant injury.  *Partout v. Harper*, 183 P.3d 771,
775 (Idaho 2008).

MEMORANDUM OF DECISION - 25

However, of particular significance here, Idaho law requires that a plaintiff prove each of the elements of fraud by clear and convincing evidence. *Country Cove Dev., Inc. v. May*, 150 P.3d 288, 293 (Idaho 2006).

Wheels failed to prove, even under the federally required preponderance of the evidence standard, that Sharp's debt was obtained through fraud in order to find that debt nondischargeable under § 523(a)(2)(A). The Court concludes that the evidence presented in this case would not be sufficient to meet the higher Idaho fraud standard of clear and convincing evidence.

Wheels therefore did not establish a fraud claim under Idaho law and, absent this or some other tortious conduct under state law, there can be no "willful and malicious injury" for purposes of § 523(a)(6) nondischargeablity.[40] *Lockerby*, 535 F.3d at 1040-41. Wheels' cause of action under § 523(a)(6) will also be dismissed.

**CONCLUSION**

For the reasons stated, Wheels' Motion to Strike, Adv. Doc. No. 32, will be granted. However, judgment will be entered for Sharp dismissing the amended

//

//

//

---

[40] Having reached this conclusion, the Court will not address further whether there was an injury that was both willful and malicious.

MEMORANDUM OF DECISION - 26

complaint.  The Court will prepare the form of judgment.

DATED: January 14, 2009



TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 27